UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**CHRISTINE MAUREEN GEORGE,**                    Chapter 13
    Debtor                                   Case No. 07-17852-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**CHRISTINE MAUREEN GEORGE,**
    Plaintiff

v.                                               Adv. P. No. 08-1068

**WILSHIRE CREDIT CORPORATION,**
**SOUTH POINT, INC., and JEFFREY MOLL,**
    Defendants

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**MEMORANDUM**

**I. INTRODUCTION**

The matter before the Court is the "Motion and Authorities in Support of Dismissal

or Abstention of the Third Party Complaint" (the "Motion to Dismiss") filed by Third-Party

Defendant, Kathleen George ("Kathleen"). Citing " F.R.C.P. 14(a), F.R.B.P. Rule 14, F.R.C.P.

Rule 12(b)(1) and 12(b)(6) and B.R. 7012," Kathleen seeks an order of dismissal, or, in the

alternative, abstention with respect to the Third-Party Complaint filed against her by

1

Wilshire Credit Corporation ("Wilshire") and South Point, Inc. ("South Point"), as assignee

of First Franklin, a division of National City Bank (collectively, the "Defendants"). The

Defendants filed an Opposition to Kathleen's Motion to which Kathleen replied. The Court

heard the Motion to Dismiss on July 14, 2008 and took the matter under advisement. The

issues presented include whether Kathleen's potential liability to the Defendants as third-

party defendant is in any way dependent upon the claims of Christine George ("Christine"

or the "Debtor") against the Defendants for purposes of Fed. R. Civ. P. 14, made applicable

to this proceeding by Fed. R. Bankr. P. 7014, governing third party practice.

## II. BACKGROUND

The Debtor filed a voluntary Chapter 13 petition on December 10, 2007. Her petition

was not signed by a guardian or next friend.

On January 10, 2008, the Debtor filed her Schedules, Statement of Financial Affairs,

Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period

and Disposable Income, and Chapter 13 Plan. On Schedule A-Real Property, she listed an

ownership interest as a "co-tenant" in a single family residence located at 12 Wass Street,

Lynn, Massachusetts (the "Lynn property"). On Schedule C-Property Claimed as Exempt,

the Debtor claimed the Lynn property as exempt pursuant to Mass. Gen. Laws ch. 188, §

1. On Schedule D-Creditors Holding Secured Claims, the Debtor listed South Point as the

holder of a secured in the sum of $92,000 pertaining to a "refinanced mortgage." Although

she also listed Wilshire on Schedule D, she did not disclose any debt owed to it. Similarly,

on Schedule F-Creditors Holding Unsecured, Nonpriority Claims, the Debtor listed Jeffrey

Moll, but did not set forth any sum of money owed to him. On Schedule H-Codebtors, she listed Kathleen as a co-debtor with respect to the claims of South Point and the City of Lynn. On Schedules I and J-Current Income and Expenditures of Individual Debtor(s), the Debtor disclosed that she is disabled. She listed social security income in the sum of $1,014 and a "contribution from sister Kathleen George" in the sum of $1,016 as the sole sources of her income. She listed monthly expenditures totaling $1,876, resulting in monthly net income of $244. In her Statement of Financial Affairs, the Debtor revealed that a "[f]oreclosure auction was held on the Debtor's house on November 29, 2007."

Although the Debtor is a below median income debtor, she filed a 60-month plan through which she proposed to pay South Point $10,000 and the City of Lynn $3,150 as the holders of secured claims. She stated the following in her plan:

> The Claim of South Point, Inc. arises from a mortgage transaction and is treated herein as a secured claim. A foreclosure auction was held on debtor's home on November 29, 2007 however, the foreclosure sale has not yet been completed. Debtor proposes to file and Adversary Proceeding, if necessary, to enforce her ownership interest in the property.

> Debtor's sister, Kathleen George, is co-owner of the 12 Wass St. Property and will contribute monthly to the payments under this Plan.

On April 16, 2008, the Debtor amended her Schedules. In particular, she amended Schedule B to include "litigation against lenders and others in Adversary Proceeding." She amended Schedules D and F, by deleting South Point as a secured creditor on Schedule D and adding it as a contingent, unliquidated, and disputed creditor on Schedule F with a claim in the sum of $106,000. She listed Wilshire as the holder of a contingent, unliquidated and disputed claim in the sum of $-0-. She also amended Schedule I to reduce her sister's

3

monthly contribution to $263 and to delete any rent or home mortgage payment to either

Defendant on Schedule J. Concomitantly, she filed an amended 36-month Chapter 13 plan

through which she proposed to pay $196 per month to satisfy real estate taxes owed to the

City of Lynn and to pay a 3% dividend to unsecured creditors with allowed claims. She

noted that she had commenced an adversary proceeding to void the mortgage

encumbering the Lynn property, and she reiterated that her "sister Catherine George [sic],

is co-owner of the 12 Wass St. property and will contribute monthly to the payments under

this Plan."

On March 27, 2008, one day after commencing the above-captioned adversary

proceeding, the Debtor filed a First Amended Complaint (the "Complaint") against the

Defendants and Jeffrey Moll. In an introductory statement to her Complaint, she indicated

that she intended to challenge the Defendants' security interest in her home on "grounds

of lack of capacity, fraud in the inducement and in the conveyance, and truth-in-lending

and Consumer Protection Act violations." She added that she is "a mentally handicapped,

mentally-ill homeowner." According to the Debtor, she and her sister were fraudulently

induced into a mortgage loan by First Franklin, which represented to her that her

ownership interest was not being encumbered or conveyed.

The Debtor stated in her Complaint that Wilshire has alleged that it is the servicing

agent for the holder of the mortgage on her residence. She further alleged that South Point

is a foreign corporation unlicensed to do business in the Commonwealth of Massachusetts

and that it is the owner of the note and mortgage on her residence. Nevertheless, in

4

paragraph 16 of her Complaint, she averred that First Franklin remains the owner of record

of the mortgage as "no transfer of these interests has ever been recorded at the Registry of

Deeds, and . . . neither South Point nor Wilshire had, at the necessary times, real or

apparent authority to convey title to the property, contract for the conveyance, or

otherwise undertake the activities complained of herein." She also alleged that Jeffrey Moll

("Moll"), who has been defaulted in this proceeding, is a real estate speculator and

developer and was the highest bidder at the foreclosure sale conducted by South Point on

November 29, 2007.

In thirty-two, separately numbered, paragraphs, the Debtor alleged the following

in support of the thirteen counts set forth in her Complaint. After her father's death, she

conveyed title to the Lynn property to herself and her sister, Kathleen, "jointly, as a party

with capacity to make financial decisions due to the Debtor's incapacity and vulnerability."

In the fall of 2006, Kathleen entered into a refinancing transaction with First Franklin

("First Franklin"), a division of National City Bank. Only Kathleen signed the note to First

Franklin. The Debtor alleged that at a closing which took place at the Lynn property on

October 26, 2006, "First Franklin represented to Christine George that her

acknowledgment, by initials or otherwise, on the loan documents signified only that she

was aware that Kathleen George was entering into a loan transaction with First Franklin."

The Debtor also alleged that she was given a series of documents to initial or sign but was

given no explanation of the nature and substance of the documents which pertained to the

mortgage and note, which had a 9.2% interest rate and required monthly payments of $766.

5

The Debtor further alleged that in January 2007 Kathleen became ill and was unable to work. Kathleen, however, eventually received long term disability payments. According to the Debtor, the delay in receipt of disability income caused the Georges to fall behind in their mortgage payments. In the summer of 2007, Wilshire and South Point commenced foreclosure proceedings. About the same time, Kathleen offered to make a payment to Wilshire from a lump sum disability payment, but Wilshire refused the payment, electing to declare a default and accelerate the note and mortgage.

Although Kathleen negotiated a Loan Modification Agreement with Wilshire and paid $300 to postpone a foreclosure sale scheduled for October 29, 2007, the Debtor alleged that Wilshire refused to execute the agreement in writing, asserting in mid-November that the agreement was unacceptable to its investors.

According to the Debtor, in November of 2007, she and her sister obtained another lender, Lend America Bank, who agreed to refinance to Lynn property in early December. Wilshire, however, refused to postpone its scheduled foreclosure sale, written notice of which, the Debtor alleged, was not sent to her by either Wilshire or South Point. The foreclosure sale took place on November 29, 2007, eleven days before the Debtor filed her Chapter 13 petition. Moll was the sole qualified purchaser. He and the auctioneer executed a Memorandum of Sale for $106,000, which allegedly has expired by its own terms.[1] The Debtor also alleged that at the time of the foreclosure sale, the Lynn property

---

[1] The Memorandum of Sale which the Debtor attached to her Complaint provides: "title to the premises shall be that which was conveyed by the mortgage deed to the mortgagee and the purchaser shall take title to the premises by the usual deed

had a value of $215,000.

In her Complaint, the Debtor recognized that Wilshire, "as Servicer for Merrill Lynch Mortgage Lending, Inc. Take title to REO in: South star I, LLC All other states: Foreclose and take to title to REO in Southstar I, LLC [sic]" filed a proof of claim on March 7, 2008 in the sum of $98,686.43. It did not attach a copy of the note, mortgage or any assignments to its proof of claim.[2]

The Debtor alleged that on February 28, 2008, through counsel, she sent a rescission letter to Wilshire and South Point through their counsel, as well as to Moll. According to the Debtor, "[n]one of the Defendants have taken any steps to effectuate the rescission letter."

Based upon the foregoing allegations, the Debtor formulated the following counts: Count I: Breach of Duty to Exercise Good Faith and Reasonable Diligence;[3] Count II: Breach of Implied Covenant of Good Faith and Fair Dealing;[4] Count III: 11 U.S.C. 548 [sic]-

---

under power of sale." The Memorandum of Sale did not include a date by which Moll was required to pay the balance of his bid price and contains no language that "time is of the essence."

[2] It withdrew its proof of claim on March 24, 2008, three days before the Debtor filed her Amended Complaint.

[3] The Debtor alleged that, as assignees or agents of First Franklin, the Defendants owed her "a fiduciary duty . . . to protect their financial position with a minimum detriment to her position as mortgagor." She added that they violated that duty by, among other things, "conducting a foreclosure sale with full knowledge of the [sic] Christine George's peculiar and precarious financial and mental health situation."

[4] Through this count for breach of contract, the Debtor sought damages and "an injunction barring them [the Defendants] from transferring the premises to Moll or any other person."

7

Fraudulent Conveyance and Transfer; Count IV: Violation of M.G.L. ch. 244, sec 14;[5] Count

V: Negligent Misrepresentation;[6] Count VI: Unconscionability;[7] Count VII: Tort;[8] Count

VIII: Infliction of Emotional Distress; Count IX: Truth in Lending Act ("TILA") violations:

15 U.S.C. § 1602, et seq;[9] Count X: Violations of Massachusetts Consumer Credit Cost

Disclosure Act ("MCCCDA"): M.G.L. c. 140D; Count XI: Violations of Massachusetts

Consumer Protection Act: M.G.L. c. 93A; Count XII: Lack of Capacity; and Count XIII: Lack

---

[5] Specifically, the Debtor asserted that the Defendants failed to send her notice of either the October 29, 2007 or November 29, 2007 foreclosure sale by registered mail, thereby rendering the foreclosure sale ineffective to foreclose the mortgage.

[6] The Debtor alleged that First Franklin made the misrepresentations and that the Defendants, "as alleged assignees, knew or should have known that, but for these misrepresentations, Ms. George would not have signed the loan."

[7] The Debtor specifically alleged that First Franklin exploited the vast disparity in bargaining power to induce her into entering a spurious and unconscionable loan "which included terms that violate various statutes and regulations governing consumer loan transactions." She did not specify which statutes or regulations they violated, however.

[8] The Debtor alleged that First Franklin was the tortfeasor and set forth a count for fraudulent misrepresentation of material terms of the loan.

[9] The Debtor alleged that First Franklin failed to provide her with numerous disclosures, including the actual finance charge, the annual percentage rate, the nature of the security interest, and the true cost of the loan. Additionally, she alleged that First Franklin failed to provide her with proper notice of her right to rescind and that, upon rescission, the Defendants failed to return any money or property given to them by her or to take any actions necessary or appropriate to reflect termination of any security interest created under the loan. The Debtor attached a copy of the rescission letter to her Complaint. Her counsel stated:

> We represent both Ms. Georges concerning the loan transaction she entered into with Household Finance Corporation on October 2, 2006 with First Franklin, which is now purportedly held by South Point, Inc. and serviced by Wilshire Credit Corp. [sic]. We have been authorized by our clients to rescind this transaction and hereby exercise this right . . . .

8

of Legal Authority or Effective, Binding Contract.

On April 25, 2008, the Defendants filed and Answer, Counterclaim and Jury Demand.   After asserting 15 affirmative defenses, including lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted, they asserted a Counterclaim against the Debtor.   Specifically, they alleged that, on October 2, 2006, the Debtor and Kathleen entered into a transaction with First Franklin pursuant to which First Franklin loaned them $90,000.   According to the Defendants, "[a] review of the HUD statement from the transaction shows that $71,524.53 of the loan funds were paid to AMC Mortgage Services, Inc., to satisfy a mortgage . . . securing the joint indebtedness of the Georges" and "that $13,566.45 was paid directly to the Georges."   The Defendants alleged that, although the Debtor was not an obligor on the note, she contributed to payments made to First Franklin on the loan.   They further alleged that First Franklin assigned the note and mortgage to South Point in January 2007 and that Wilshire has been appointed attorney-in-fact and servicer for South Point.   According to the Defendants, on September 6, 2007, they served an order of notice on Kathleen and Christine George and properly conducted a foreclosure sale on November 29, 2007, having postponed the original foreclosure sale by proclamation.   Based upon those allegations, the Defendants formulated four counts: Count I: Monies Due and Owing; Count II: Breach of Contract; Count III: Unjust Enrichment; and Count IV: Quasi Contract.

In addition to the Counterclaim against the Debtor, the Defendants filed a "Third-Party Complaint and Jury Demand against Kathleen.  In their Third-Party Complaint, the

9

Defendants, referencing an attached HUD Settlement Statement, alleged that $71,524.53 of the First Franklin loan funds were paid directly to AMC Mortgage Services, Inc. to pay off an existing mortgage on the Lynn property and that $13,566.45 were paid directly to the Debtor and/or Kathleen.

The Defendants further alleged that the note called for payments of $766.52 per month, apart from any fees or escrows. According to the Defendants, in January 2007, the note and mortgage were assigned by First Franklin to South Point, and Wilshire became the authorized servicer. The Defendants averred that "[g]oing forward, both Kathleen and Christine acted as if the Note and Mortgage were binding and valid and made payments on the loan" until March of 2007 when they defaulted by failing to make the required monthly payment. The Defendants stated that, on or about April 10, 2007, Wilshire sent Kathleen a letter notifying her of the default and informing her that, if the past due amounts were not paid within 30 days, the entire amount due under the note would be immediately payable. Because the Georges failed to make the required payment, the Defendants, on September 6, 2007, served an Order of Notice issued by the Massachusetts Land Court on the Georges reflecting the filing of a foreclosure complaint.

The Defendants further represented that South Point conducted a foreclosure sale on November 29, 2007 and executed a memorandum of sale with Moll for $106,000.

Relying upon the Affidavit of Kathleen George in Support of Motion for Injunctive Relief, the Defendants stated that Kathleen has represented under penalty of perjury that after their father's death, the Debtor conveyed the Property so as to establish a joint

10

tenancy and that she is the "person with capacity to make financial decisions due to

Christine's incapacity." The Defendants further alleged that Kathleen represented that, at

the October 2, 2006 closing, "the closing agent did not explain the documents to Christine

or to me" and that he "told Christine that her initialing the loan documents and signing the

mortgage signified that she was aware that I was taking out a mortgage." According to the

Defendants, Kathleen was aware of Christine's incapacity, but failed to make that

incapacity known to First Franklin, who did not know of Christine's condition and lack of

capacity to enter into the transaction.

Based upon those allegations, the Defendants formulated five counts against

Kathleen: Count I: Breach of Contract; Count II: Monies Due and Owing; Count III: Fraud

and/or Breach of Trust; Count IV: Unjust Enrichment; and Count V: Implied Contract.

Specifically, in Count III, the Defendants asserted that "Kathleen committed fraud on the

Defendants [sic] by closing on the loan transaction while aware of Christine's incapacity

to sign the mortgage and failing to disclose said incapacity to First Franklin." They also

asserted that Kathleen violated her fiduciary obligations to Christine by taking advantage

of her lack of mental competence.[10]

### III. POSITIONS OF THE PARTIES

A. <u>Kathleen George</u>

Kathleen seeks dismissal of the Third-Party Complaint against her based upon Fed.

---

[10] Indeed, in their brief, they asserted that her bankruptcy estate may have a
potential claim against Kathleen and "[l]itigation and resolution of the Third-Party
Complaint may lead to potential benefit to the estate."

R. Civ. P. 14(a), made applicable to this proceeding by Fed. R. Bankr. P. 7014. She also argues that this Court lacks jurisdiction over the Third-Party Complaint and that it should be dismissed. She maintains that the Defendants, through all five of the counts of the Third-Party Complaint, seek money damages against her as a third-party and that there can be no conceivable impact on the Debtor's bankruptcy estate. She maintains that the Third-Party Complaint is, at most, a "related to," non-core proceeding. Citing In re Boston Reg'l Med. Ctr., Inc., 410 F.3d 100, 105 (1st Cir. 2005), she asserts that "related to" jurisdiction exists only if the outcome of the Third-Party Complaint "potentially [could] have some effect on the bankruptcy estate, such as altering the debtor's rights, liabilities or options, or freedom of action, or otherwise have an impact upon the handling and administration of the bankruptcy estate."

Kathleen also argues that, if the Defendants prevail in their third-party claims, they will have a judgment against her that "is meaningless in relation to the bankruptcy estate of Christine George." She adds, citing In re Thomas, No. 05-64078, 2007 WL 1594319 (Bankr. N.D. Ohio 2007), that even where the adversary proceeding and Third-Party Complaint are based upon the same set of operative facts, "overlapping facts are not sufficient to confer jurisdiction, even where judicial economy is promoted."

Finally, Kathleen argues that, even if this Court were to conclude it has "related to" jurisdiction, it should refuse to hear the Third-Party Complaint under the permissive abstention doctrine contained in 28 U.S.C. § 1334(c)(1). She maintains that "no 'interests of justice' commend this Court's retention of this matter."

B. <u>The Defendants and Third Party Plaintiffs</u>

_____The Defendants rely upon the premise that Kathleen, as the person with the capacity to make financial decisions for the Debtor, while knowing of the Debtor's alleged incapacity, signed a mortgage and permitted her sister to sign a mortgage, without advising First Franklin of the Debtor's incapacity. The Defendants argue that the Third-Party Complaint is proper under Fed. R. Civ. P. 14, made applicable to this proceeding by Fed. R. Bankr. P. 7014. They assert that the Rule 14 was intended to reduce multiplicity of litigation and should be liberally construed. Citing <u>Farmers Prod. Credit Ass'n of Oneonta v. Whiteman</u>, 100 F.R.D. 310, 313 (D.C. N.Y. 1983), they further argue that the claim for fraud set forth in their Third-Party Complaint is entirely derivative of any liability that they may have to the Debtor. Additionally, citing Fed. R. Civ. P. 18, made applicable to this proceeding by Fed. R. Bankr. P. 7018, they add that once a single claim lies against Kathleen under Rule 14, all other claims lie.

The Defendants also maintain that forcing them to file a separate action against Kathleen violates judicial notions of economy and fairness as "[b]oth cases involve the same transaction, the same witnesses and the same legal issues." Finally, the Defendants assert that this Court has jurisdiction over the third party claims. Citing <u>In re Gold</u>, 247 B.R. 574 (Bankr. D. Mass. 2000), they maintain that "the scope of Kathleen's ownership of the 12 Wass Street property and her obligations to Wilshire and South Point and/or Christine all could have an effect on the bankruptcy estate."

Finally, the Defendants argue there is no basis for abstention.

13

## IV. DISCUSSION

The recitation of facts and allegations set forth above unequivocally demonstrate that Kathleen's testimony will be integral to the resolution of this adversary proceeding and, indirectly, the success of the Debtor's Chapter 13 plan.  On the one hand, the Debtor and Kathleen are similarly situated to the extent that First Franklin or its agents allegedly engaged in misconduct at the loan closing held on October 2, 2006 and potentially violated state and federal truth-in-lending and consumer protection laws either at the closing or during the period leading up to the November 29, 2007 foreclosure sale.  Indeed, Debtor's counsel represents both Christine and Kathleen and sent a rescission letter to South Point pursuant to TILA and MCCCDA, as well as the Home Ownership and Equity Protection Act of 1994, 15 U.S.C. § 1639, and Massachusetts High Cost Mortgage Loan Regulation, 209 C.M.R. § 32.23, on their behalf.  On the other hand, Kathleen executed both the note and mortgage but, unlike the Debtor, who has asserted lack of capacity, she may not have other defenses as a result of the November 29, 2007 foreclosure sale of the Lynn property and the execution of the Memorandum of Sale.[11]  *See* Brown v. Fin. Enterprises Corp. (In re Hall), 188 B.R. 475 (Bankr. D. Mass. 1995); 15 U.S.C. § 1635. Moreover, to the extent that Kathleen

---

[11] An issue unaddressed by any party that looms over this proceeding is whether the Debtor's First Amended Complaint is largely futile.  Assuming, without deciding that the Debtor lacked capacity to contract and is not bound by the mortgage, the question remains as to whether the Lynn property would still be encumbered by the mortgage because of Kathleen's actions in executing both the note and mortgage. *Cf.* Coraccio v. Lowell Five Cents Sav. Bank, 415 Mass. 145 (1993). *See also* Norwest Bank Minn., N.A. v. McKinnon, No. 27955, 2007 WL4563642 (Mass. Land Ct. Dec. 31, 2007); Option One Mortgage Corp. v. Oakem, 72 Mass. App. Ct. 1104 ( 2008).

14

may have permitted her sister to execute the mortgage to First Franklin at a time when she

lacked capacity, the Debtor may have a cause of action against Kathleen, if the Debtor

lacked the capacity to authorize Kathleen to execute the note and mortgage.[12]   Although

such a cause of action may well be valueless for any number of reasons, including a lack

of a legal obligation on the part of Kathleen to the Debtor as a court-appointed guardian

or next friend, or the Debtor's probable reluctance to commence an action against her sister,

it could create a potential conflict of interest between the siblings.   Nevertheless, the

Defendants' third-party claims emphasize Kathleen's position as an indispensable party

---

[12] *See generally* <u>Brennan v. Brennan</u>, No. 1995 WL 1146212 (Mass. Super. Dec. 6,
1995), in which the court observed:

> In a joint tenancy, "[e]ach joint tenant enjoys the right to use and possess
> the entire property subject to a similar right of each cotenant of the same
> property." <u>Moat v. Ducharme</u>, 28 Mass.App.Ct. 749, 753, 555 N.E.2d 897
> (1990). One joint tenant may convey his or her interest in the joint tenancy
> to a third party without the prior consent of the other cotenants. 48A C.J.S.
> Joint Tenancy § 35(b) (1981). However, one joint tenant acting alone
> cannot sell, convey, or encumber the joint property so as to bind his
> cotenants or divest them of their interest unless they have previously
> authorized or subsequently ratified such sale or conveyance. <u>Id.</u> at § 35(a).
> *See* <u>Heffernan v. Wollaston Credit Union</u>, 30 Mass.App.Ct. 171, 177, 567
> N.E.2d 933 (1991). Such a conveyance, however, is not absolutely void,
> and will operate as an estoppel against the grantor-joint tenant passing his
> title or interest in the property to the grantee. 48A C.J.S. Joint Tenancy §
> 35(a) (1981). *See* <u>Varnum v. Abbot</u>, 12 Mass. 474, 478 (1815). *See* <u>Hockett v.
> Larson</u>, 742 F.2d 1123, 1125-26 (8th Cir.1984) (Husband and wife joint
> tenants; and where husband forged wife's name on deed conveying joint
> property without her knowledge or authority, the Court held that deed
> was not void, but effective to convey only husband's interest in property
> and to sever joint tenancy leaving wife as tenant in common with grantee).

<u>Id.</u> at * 4. *See also* <u>In re Rauh</u>, 164 B.R. 419, 424 (Bankr. D. Mass. 1994);

to the resolution of the legal and factual issues raised in this adversary proceeding.[13]

Whether she is an indispensable party, however, is a separate issue from the one raised by

the Motion to Dismiss, namely whether Kathleen is properly a third-party defendant.

The specific issues that emerge from the parties' factual allegations, pleadings and

briefs are 1) whether Fed. R. Civ. P. 14 permits the filing of the Third-Party Complaint by

the Defendants against Kathleen; and 2) whether this Court has jurisdiction to entertain the

Third Party Complaint, and, if so, whether this Court should abstain from determining the

Third Party Complaint. The first issue, which is predicated upon the Defendants' claim for

fraud being entirely derivative of any liability that they may have to the Debtor, is

determinative, as the Court finds that it has "related-to" jurisdiction with respect to the

Defendants' claims against Kathleen. *See* 28 U.S.C. §§ 1334(b), 157.

The <u>Pacor</u> test, *see* <u>Pacor, Inc. v. Higgins</u>, 743 F.2d 984, 994 (3d Cir.1984), for related-

to jurisdiction has been adopted in this circuit. <u>In re G.S.F. Corp.</u>, 938 F.2d 1467, 1475 (1st

Cir. 1991) (recognizing <u>Pacor</u> as the "usual articulation" of the related-to jurisdiction test);

<u>Cenith Partners, L.P. v. Hambrecht & Quist, Inc. (In re VideOcart, Inc.)</u>, 165 B.R. 740 (Bankr.

D. Mass.1994) (applying <u>Pacor</u> test). The First Circuit has stated that it has

---

[13] *See* <u>In re Windsor Communications Group, Inc.</u>, 63 B.R. 126, 130 (Bankr. E.D. Pa. 1985)("Although no prescribed formula exists for determining whether a person is an indispensable party, the concept includes elements of prejudice, equity, and good conscience. An indispensable party possesses a material interest in the controversy."). *See also* <u>Hoover v. Gershman Inv. Corp.</u>, 744 F.Supp. 60, 64 (D. Mass. 1991); <u>In re Dinkins</u>, 79 B.R. 253 (Bankr. E.D. Pa. 1987)("where one of two tenants in common seeks to vindicate rights which do not relate exclusively to his or her own interests, the other co-tenant must be joined"); *But see* <u>In re Mosley</u>, 85 B.R. 942 (Bankr. E.D. Pa. 1998).

16

defined "related to" proceedings as proceedings which "'potentially have some effect on the bankruptcy estate, such as altering debtor's rights, liabilities, options, or freedom of action, or otherwise have an impact upon the handling and administration of the bankrupt estate.'"

In re Middlesex Power Equip. & Marine, Inc., 292 F.3d 61, 68 (1st Cir. 2000); See also In re Boston Reg'l Med. Cntr., Inc., 410 F.3d at 105; In re Gold, 247 B.R. at 577-78.  Kathleen is a co-owner of the Lynn property, jointly liable with the Debtor to the Defendants with respect to the mortgage on the Lynn property, until the Court rules otherwise, and a contributor to the funding of the Debtor's Chapter 13 plan.  Both she and the Debtor have sought to rescind the mortgage executed in favor of First Franklin.   Under these circumstances, any judgment that the Defendants might obtain against Kathleen undoubtedly would affect the  Debtor's bankruptcy estate, as well as her options and freedom of action, particularly as Kathleen, in her own words, is the "person with capacity to make financial decision due to Christine's incapacity."

Turning to the issue of Kathleen's status as third-party defendant, Fed. R. Civ. P. 14(a), which is made applicable to this proceeding by Fed. R. Bankr. P. 7014, provides in relevant part:

(a) When a Defending Party May Bring in a Third Party.

(1) Timing of the Summons and Complaint. A defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it. But the third-party plaintiff must, by motion, obtain the court's leave if it files the third-party complaint more than 10 days after serving its original answer.

(2) Third-Party Defendant's Claims and Defenses. The person served with the summons and third-party complaint--the "third-party defendant":

17

(A) must assert any defense against the third-party plaintiff's claim under Rule 12;

(B) must assert any counterclaim against the third-party plaintiff under Rule 13(a), and may assert any counterclaim against the third-party plaintiff under Rule 13(b) or any crossclaim against another third-party defendant under Rule 13(g);

(C) may assert against the plaintiff any defense that the third-party plaintiff has to the plaintiff's claim; and

(D) may also assert against the plaintiff any claim arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the third-party plaintiff.

(3) Plaintiff's Claims Against a Third-Party Defendant. The plaintiff may assert against the third-party defendant any claim arising out of the transaction or occurrence that is the subject matter of the plaintiffs claim against the third-party plaintiff. The third-party defendant must then assert any defense under Rule 12 and any counterclaim under Rule 13(a), and may assert any counterclaim under Rule 13(b) or any crossclaim under Rule 13(g).

(4) Motion to Strike, Sever, or Try Separately. Any party may move to strike the third-party claim, to sever it, or to try it separately.

(5) *Third-Party Defendant's Claim Against a Nonparty. A third-party defendant may proceed under this rule against a nonparty who is or may be liable to the third-party defendant for all or part of any claim against it.*

Fed. R. Civ. P. 14 (emphasis supplied).  Three other rules are pertinent to the Kathleen's

Motion to Dismiss the Defendants' Third Party Complaint, namely Fed. R. Civ. P. 13(h) and

Fed. R. Civ. P. 19.[14]

---

[14] Rule 13(h) provides: "Rules 19 and 20 govern the addition of a person as party to a counterclaim or crossclaim.   Fed. R. Civ. P. 13(h), made applicable to this proceeding by Fed. R. Bankr. P. 7013.  Rule 19, in turn, provides:

(a) Persons Required to Be Joined if Feasible.

(1) Required Party. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction

18

In In re John Peterson Motors, Inc., 56 B.R. 588 (Bankr. D. Minn. 1986), the court observed:

> The primary purpose of Rule 14 is to promote judicial efficiency and it is intended to provide a mechanism for disposing of multiple claims arising from a single set of facts in one action. Colton v. Swain, 527 F.2d 296 (7th Cir., 1975); Eastman Chemical International, Ltd. v. Virginia National Bank, 94 F.R.D. 21, (D. C. Tenn.1981); Tiesler v. Martin Paint Stores, 76 F.R.D. 640 (D.C.Pa.1977); In re Joyanna Holitogs, Inc., 21 B.R. 323 (Bktcy. S.D.N.Y. 1982). A third-party action is proper only when the third-party's liability is somehow dependent on the outcome of the main action or when the third party is secondarily liable to the defendant. Hefley v. Textron, Inc., 713 F.2d 1487 (10th Cir.1983); U.S. v. Joe Grasso & Son, Inc., 380 F.2d 749 (5th Cir. 1967); Index Fund, Inc. v. Hagopian, 417 F.Supp. 738 (S.D.N.Y. 1976). In order to maintain a third-party complaint, a direct line of liability must be alleged to exist between the third-party plaintiff and third-party defendant.

---

> must be joined as a party if:
>
> > (A) in that person's absence, the court cannot accord complete relief among existing parties; or
> > (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the persons absence may:
> > > (i) as a practical matter impair or impede the person's ability to protect the interest; or
> > > (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.
>
> (2) Joinder by Court Order. If a person has not been joined as required, the court must order that the person be made a party. A person who refuses to join as a plaintiff may be made either a defendant or, in a proper case, an involuntary plaintiff.

Fed. R. Civ. P. 19, made applicable to this proceeding by Fed. R. Bankr. P. 7019.

19

> Moorhead Construction Company, Inc. v. City of Grand Forks, 508 F.2d 1008
> (8th Cir. 1975), citing 6 Wright and Miller, Federal Practice and Procedure §
> 1442. It is not enough that the third-party claim is alleged to stem from the
> same transaction. Nagunst v. Western Union Tel. Co., 76 F.R.D. 631 (D.C.
> Kansas 1977). Finally, while Rule 14 should be liberally construed, the
> permissibility of a third-party action is committed to the discretion of the
> court. Farmers & Merchants Mutual Fire Insurance Company v. Pulliam, 481
> F.2d 670 (10th Cir.1973); General Electric Company v. Irvin, 274 F.2d 175 (6th
> Cir.1960); Wright and Miller, Federal Practice & Procedure: Civil § 1443.

Id. at 592.  See also In re Street, 283 B.R. 775 (Bankr. D. Ariz. 2002).  In Street, the court

succinctly summarized the requirements of the Rule 14, finding three requirements:

> First, the third-party defendant's "liability must be derivative and must flow
> to the third-party plaintiff; mere liability by the third-party defendant to the
> plaintiff (as opposed to the third-party plaintiff) will not suffice." Hawkins
> v. Eads (In re Eads), 135 B.R. 387, 395 (Bankr. E.D.Cal. 1991). Second, that
> liability "must be for losses that the third-party plaintiff suffers in the
> capacity of defendant on the plaintiff's claim." Id. Finally, any claims that are
> not derivative cannot be advanced under Rule 14 even though they arise out
> of the same transaction or occurrence. Thus "the transaction-based analysis
> that emphasized the existence of a common nucleus of operative facts is
> central to pendent jurisdiction and to compulsory counterclaims and
> cross-claims but takes a back seat to derivative liability when it comes to
> impleader and ancillary jurisdiction." Id. But if the derivative liability is
> shown, it does not matter that the theory is negligence rather than indemnity
> or contribution. Id.

283 B.R. at 780.

The Court finds that the Defendants have failed to satisfy the tests set forth in

Peterson Motors and Street. Although there can be no dispute that the Defendants' third-

party action arises out of the same loan "transaction" which took place on October 26, 2006

and the same "occurrences" occasioned by Defendants' conduct in foreclosing the

mortgage on the Lynn property, the Court concludes that the Defendants' attempt to

establish that Kathleen is secondarily liable to them fails. If the Debtor were to prevail on

20

her claims of fraud and violations of truth-in-lending and consumer protection statutes against the Defendants, Kathleen would not be derivatively liable to the Defendants for that conduct. Her alleged failure to inform First Franklin of Christine's lack of competence does not transform direct liability into derivative liability for purposes of Rule 14. The Court finds that the Defendants' allegations with respect to Kathleen's tort liability are too tenuous to support a Third-Party Complaint against her. To repeat, her liability to the Defendants is direct, not secondary or derivative of the Debtor's claims against the Defendants and could survive even in the absence of the current litigation commenced by the Debtor.

Although Kathleen is not a proper third-party defendant, authority exists for the Defendants to assert a counterclaim against her, if she is added as a plaintiff. This Court has directed the Debtor to show cause why Kathleen should not be added to the Complaint as a party plaintiff pursuant to Rule 19. The Defendants' claims against Kathleen, except for Count III for fraud and breach of trust, are virtually identical to the claims asserted by the Defendants against the Debtor in their Counterclaim. Were the Debtor to add, or the Court to require her to add, Kathleen as a plaintiff, the Defendants could assert counterclaims against her, thereby effectuating the policies of judicial efficiency and the disposition of multiple claims arising from a single set of facts in one action.

**IV. CONCLUSION**

In view of the foregoing, the Court shall enter an order granting Kathleen's Motion to Dismiss. Accordingly, the Court need not address Kathleen's arguments in favor of abstention.

By the Court,

*Joan N. Feeney*

Joan N. Feeney
United States Bankruptcy Judge

Dated: August 26, 2008
cc: Roger Bertling, Esq., Paul R. Collier, III, Esq., Christopher J. DeCosta, Esq., Paul Michienzie, Esq.